1

2                                                              O

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    CENTRAL DISTRICT OF CALIFORNIA

10

11   JAMILA S. A. J.,                          Case No.  5:16-cv-02032-KES

12              Plaintiff,

13      v.                                      MEMORANDUM OPINION AND
                                                          ORDER
14   NANCY A. BERRYHILL, Acting
     Commissioner of Social Security,[1]
15
                Defendant.
16

17

18                                  I.

19                            BACKGROUND

20         On November 15, 2010, Ms. Jamila S. A. J. ("Plaintiff") filed an application

21   for disability insurance benefits ("DIB") and supplemental security income ("SSI")

22   alleging disability commencing December 10, 2009.  Administrative Record

23   ("AR") 127-28.  Plaintiff later claimed an onset date of October 1, 2010.  AR 29.

24         On May 24, 2012, an Administrative Law Judge ("ALJ") conducted a

25   hearing at which Plaintiff, who was represented by counsel, appeared and testified,

26   ────────────────────
            [1] Effective November 17, 2017, Ms. Berryhill's new title is "Deputy
27   Commissioner for Operations, performing the duties and functions not reserved to
     the Commissioner of Social Security."
28

                                       1

as did a vocational expert ("VE").  AR 27-55.  On July 23, 2012, the ALJ issued a decision denying Plaintiff's applications.  AR 61-76.

After an appeal to the district court (case no. 5:13-cv-02112-JCG), Plaintiff's case was remanded for further administrative proceedings.  AR 1047-52.  The Appeals Council issued an order on January 27, 2015, directing the ALJ to offer Plaintiff a hearing, take any further action necessary to complete the administrative record, and issue a new decision.  AR 1059-63.

A different ALJ conducted another hearing on September 28, 2015.  AR 934-67.  The ALJ considered Plaintiff's original applications and new SSI and DIB applications that Plaintiff filed on October 18, 2013.  AR 909.  The ALJ published an unfavorable decision on November 12, 2015.  AR 906-31.

The ALJ found that Plaintiff suffered from medically determinable severe impairments consisting of "degenerative disc disease of the cervical and lumbar spines; bilateral carpal tunnel syndrome; history of right shoulder injury status post-surgery in 2007; and depression."  AR 912.  Despite these impairments, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform a limited range of light work, as follows:

> [She] can lift/carry 20 pounds occasionally and 10 pounds frequently;
> … can stand/walk six hours in an eight-hour workday; … can sit 6
> hours in an 8 hour day; … can engage in occasional postural
> activities; … cannot climb ladder, ropes, or scaffolds; … can perform
> above the shoulder work bilaterally on an occasional basis; … can
> engage in frequent, but not constant, fine and gross manipulative
> activities bilaterally; … can engage in frequent, but not constant, foot
> pedals or controls bilaterally; … [must] avoid excessive cold and
> vibration; … cannot work around unprotected heights or dangerous
> machinery; … limited to non-complex, routine tasks; …not to engage
> in tasks requiring hypervigilance; … not to engage in a job

2

responsible for the safety of others; [and] … not to engage in a job requiring public interaction.

AR 913-14.

The ALJ compared the assessed RFC to the demands of Plaintiff's past relevant work as a hairstylist, Dictionary of Occupational Titles ("DOT") 322.271-018; warehouse picker, DOT 922.687-058; auto rental driver, DOT 919.663-010; order filler, DOT 222.487-014; and photo technician, DOT 249.366-010, and the ALJ decided that Plaintiff could not perform that kind of work. AR 919.

Based on the assessed RFC and the VE's testimony, the ALJ determined that Plaintiff could work as a shoe packer, DOT 920.687-166; advertising-material distributor, DOT 230.687-010; and plastic toy assembler, DOT 731.687-034. AR 920. The ALJ concluded that Plaintiff was not disabled. AR 921.

## II.

## LEGAL STANDARDS

### A. **The Sequential Evaluation Process.**

The ALJ follows a five-step sequential evaluation process in assessing whether a claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); Lester v. Chater, 81 F.3d 821, 828 n. 5 (9th Cir. 1996). In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim must be denied. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

If the claimant is not engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting his ability to do basic work activities; if not, a finding of not disabled is made and the claim must be denied. Id. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).

If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or

combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R., Part 404, Subpart P, Appendix 1; if so, disability is conclusively presumed and benefits are awarded.  Id. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient RFC to perform his past work; if so, the claimant is not disabled and the claim must be denied.  Id. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  The claimant has the burden of proving he is unable to perform past relevant work.  Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992).  If the claimant meets that burden, a prima facie case of disability is established.  Id.

If that happens or if the claimant has no past relevant work, the Commissioner then bears the burden of establishing that the claimant is not disabled because he can perform other substantial gainful work available in the national economy.  20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  That determination comprises the fifth and final step in the sequential analysis.  Id. §§ 404.1520, 416.920; Lester, 81 F.3d at 828 n. 5; Drouin, 966 F.2d at 1257.

B. **Standard of Review.**

A district court may review the Commissioner's decision to deny benefits. The ALJ's findings and decision should be upheld if they are free from legal error and are supported by substantial evidence based on the record as a whole.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007).  Substantial evidence means such relevant evidence as a reasonable person might accept as adequate to support a conclusion. Richardson, 402 U.S. at 401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).  It is more than a scintilla, but less than a preponderance.  Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Comm'r of SSA, 466 F.3d 880, 882 (9th Cir.

2006)).  To determine whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion."  Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998).  "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for that of the Commissioner.  Id. at 720-21.

"A decision of the ALJ will not be reversed for errors that are harmless." Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005).  Generally, an error is harmless if it either "occurred during a procedure or step the ALJ was not required to perform," or if it "was inconsequential to the ultimate nondisability determination."  Stout v. Comm'r of SSA, 454 F.3d 1050, 1055 (9th Cir. 2006).

### III.

### ISSUES PRESENTED

Issue One:  Whether the ALJ properly evaluated Plaintiff's subjective pain testimony;

Issue Two:  Whether the VE identified occupations consistent with Plaintiff's RFC.  (Dkt. 26, Joint Stipulation ["JS"] at 5.)

### IV.

### DISCUSSION

A. **ISSUE ONE:  The ALJ's Evaluation of Plaintiff's Pain Testimony.**

**1. Rules Governing the Evaluation of Subjective Symptom Testimony.**

An ALJ's assessment of pain level is entitled to "great weight."  Weetman v. Sullivan, 877 F.2d 20, 22 (9th Cir. 1989) (citation omitted); see also Nyman v. Heckler, 779 F.2d 528, 531 (9th Cir. 1986).  "[T]he ALJ is not 'required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A).'"  Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012) (citation omitted).

If the ALJ finds that a claimant's testimony as to the severity of his pain and impairments is unreliable, "the ALJ must make a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." Thomas v. Barnhart, 278 F.3d 947, 958 (9th Cir. 2002). If the ALJ's credibility finding is supported by substantial evidence in the record, courts may not engage in second-guessing. Id.

In evaluating a claimant's subjective symptom testimony, the ALJ engages in a two-step analysis. Lingenfelter, 504 F.3d at 1035-36. "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment [that] could reasonably be expected to produce the pain or other symptoms alleged." Id. at 1036. If so, the ALJ may not reject a claimant's testimony "simply because there is no showing that the impairment can reasonably produce the degree of symptom alleged." Smolen v. Chater, 80 F.3d 1273, 1282 (9th Cir. 1996).

Second, if the claimant meets the first test, the ALJ may discredit the claimant's subjective symptom testimony only if he makes specific findings that support the conclusion. Berry v. Astrue, 622 F.3d 1228, 1234 (9th Cir. 2010). Absent a finding or affirmative evidence of malingering, the ALJ must provide "clear and convincing" reasons for rejecting the claimant's testimony. Lester, 81 F.3d at 834; Ghanim v. Colvin, 763 F.3d 1154, 1163 & n.9 (9th Cir. 2014).

Here, the ALJ issued his decision on November 12, 2015. At that time, Social Security Ruling ("SSR") 96-7p had not been superseded by SSR 16-3p (which superseded SSR 96-7p on March 28, 2016). The Court notes that the SSR changes appear immaterial to the ALJ's analysis in this case. Both SSRs note that, in assessing a claimant's subjective symptom testimony, ALJs should consider, in addition to the objective medical evidence: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage,

effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. Compare SSR 96-7p, 1996 WL 374186, and SSR 16-3p, 2017 WL 5180304; see also 20 CFR §§ 404.1529, 416.929 (effective to March 26, 2017, reflecting same factors).

### 2. The ALJ's Evaluation of Plaintiff's Testimony.

Plaintiff has complained of neck and back pain for years. She testified that her pain is so severe that she spends half her average day in bed. AR 39, 149. She testified that she has not gotten any better over the last ten years. AR 956. She testified, "Whether it be my neck; my back; my hands; or whatever other party of my body, I am in pain from my neck to my toes, literally." AR 957.

The ALJ found that Plaintiff's impairments "could not reasonably be expected to cause the alleged symptoms," and that her "statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible…." AR 31. The ALJ gave at least five reasons supporting this finding: (1) lack of supporting medical evidence, (2) failure to use best effort during psychological testing, (3) non-compliance with prescribed treatment, (4) inconsistent statements, and (5) history of "mild and conservative" treatment. AR 914-15, 918.

Before considering each of these reasons in turn, the Court will address Plaintiff's one general challenge to the ALJ's adverse evaluation of her testimony. Plaintiff argues that the ALJ erred by failing to "consider any statements that [Plaintiff] testified to or reported in her function reports." (JS at 9.) The ALJ,

however, stated that he considered statements about the intensity and limiting effects of Plaintiff's pain and found Plaintiff not "fully credible." AR 914, 918. He referenced her hearing testimony about when and why she stopped working. AR 918-19. This sufficiently identified the aspects of Plaintiff's testimony that the ALJ discounted. See Holohan v. Massanari, 246 F.3d 1195, 1208 (9th Cir. 2001) ("[T]he ALJ must specifically identify the testimony she or he finds not to be credible and must explain what evidence undermines the testimony.").

        a. Reason One: Lack of Supporting Medical Evidence.

The ALJ determined that Plaintiff's impairments of the lumbar and cervical spine would limit "certain aspects" of her functioning and therefore restricted her RFC to a limited range of light work. AR 914. The ALJ also determined, however, that the degenerative changes were not "so severe" as to cause pain that would prevent Plaintiff from performing work consistent with the assessed RFC. Id.

The ALJ based this on the following medical evidence:

• Spinal x-rays and MRIs which confirmed degenerative changes, some characterized as moderate, others as mild. AR 914, citing AR 255 (5/4/07: "mild" degenerative changes to cervical spine); AR 260-61 and AR 388-89 (1/13/11: "mild" and "moderate" degenerative changes); AR 587 (4/10/12: "mild" progression at C6 level compared to 2011 MRI; "otherwise relatively stable"); AR 1787-92 (4/13/15: physical examination and x-rays).

• 12/15/13 examination by Dr. Moazzaz. AR 1692-96. Dr. Moazzaz observed that Plaintiff had a normal gait and could squat. AR 1693. Dr. Moazzaz performed negative straight leg raising tests. AR 1694. Plaintiff had a negative Spurling test and negative Hoffman sign. AR 1695. Dr. Moazzaz opined that Plaintiff could perform work consistent with the assessed RFC. AR 1696.

• 4/13/15 examination by Dr. Hoang. AR 1787-92. Dr. Hoang observed that Plaintiff had a normal gait and could squat and rise, do heel/toe walking, and get on and off the examining table without difficulty. AR 1788. Straight leg raising tests

were negative. AR 1789. Dr. Hoang observed no muscle spasm, full range of motion for the lumbosacral spine, and no atrophy. AR 1789. Dr. Hoang rated her motor strength as 5/5 and opined that she could do work consistent with the assessed RFC. AR 1790-91.

• Hearing testimony by medical expert, Dr. Francis. AR 945-56. After reviewing Plaintiff's medical records, Dr. Francis testified that despite chronic muscoloskeletal pain, Plaintiff could do light work. AR 951-52.

Plaintiff argues that the medical evidence is "consistent" with a finding that her impairments prevent her from working. (JS at 9.) Plaintiff does not, however, explain why mild or moderate degenerative changes to her spine would be expected to cause pain so severe that she must spend much of her day lying down, even when taking pain medication. Plaintiff points to the fact that on June 18, 2013, she received an Oswestry score of 46% which is consistent with severe disability. (JS at 10.) This metric, however, was based on Plaintiff's subjective complaints. AR 1628. It does not undermine the ALJ's finding that the objective medical evidence does not support a finding of disabling pain.

b. <u>Reason Two</u>: Failure to Use Best Effort.

Lack of cooperation or "poor effort" during consultative examinations may support an adverse credibility determination. See <u>Tonapetyan v. Halter</u>, 242 F.3d 1144, 1148 (9th Cir. 2001). The ALJ cited the following as evidence supporting his finding that Plaintiff did not use her best efforts on psychological testing:

> [T]he evidence suggests the claimant did not put forth her best effort on examination. At the psychological examination, the consultant noted that the claimant had a full scale IQ score of 66, which was in the extremely low range. (AR 1783.) However, the consultant also noted that this was an underestimate given that the claimant took several pain pills during the interview and was sleepy during the examination." (<u>Id.</u>) The psychiatric examiner also indicated that the

9

1       claimant was very sluggish throughout the evaluation, suggesting that

2       the claimant failed to put forth her best effort.  (AR 1697-1702.)

3  AR 918.

4       At the referenced psychological examination on April 1, 2015, Dr. Zhang

5  noted that Plaintiff arrived for the appointment unaccompanied and had driven

6  herself.  AR 1780.  Plaintiff told Dr. Zhang that she can do basic self-care, care for

7  her children, drive, manage household finances, and prepare simple meals.  AR

8  1781-82.  She had not worked since March 2014.  AR 1781.  She reported

9  "occasional auditory hallucinations."  AR 1782.  Dr. Zhang characterized her as a

10  "fair" historian.  AR 1780.

11       On a mental status exam, Dr. Zhang observed that Plaintiff was "reasonably

12  cooperative" and "appears truthful" but "sleepy" with "her eyes closed during part

13  of the interview, and [she] fell asleep a few times."  AR 1782.  Plaintiff was unable

14  to state the similarities between a boat and an automobile; she could not interpret

15  the proverb "One should not judge a book by its cover," and she could not spell

16  "world" backwards.  Id.

17       Dr. Zhang administered an IQ test and a memory test.  Regarding the IQ test,

18  Dr. Zhang noted:

19       The results of this test indicate that the claimant is functioning in the

20       extremely low range of intelligence with a Full Scale IQ score of 66.[2]

21       …  These scores appear to be underestimates of her actual intellectual

22       functioning and are consistent with her impaired mental status and

23       sleepiness during the testing process.  She took several pain pills

24

25  ⎯⎯⎯⎯⎯⎯⎯⎯⎯

26       [2] Dr. Zhang further noted that an average IQ score is 100 and that 98% of the population falls between 70 and 130.  AR 1783.  As a further point of reference, an

27  IQ score of 70 is the "accepted level for intellectual disability."  Hall v. Florida, __

28  U.S. __, 134 S. Ct. 1986, 2003 (2014).

during this interview.[3]

AR 1783.  Consistent with not believing the results of Plaintiff's IQ test, Dr. Zhang opined that her ability to understand and carry out simple instructions was unimpaired, while her ability to understand and carry out "detailed and complex" instructions was only mildly impaired.  AR 1785.

Regarding the memory test, Dr. Zhang noted that the average Index Score was again 100, with 98% of the population scoring between 70 and 130.  AR 1783.  Plaintiff's index scores for various aspects of memory ranged between 61 and 67.  AR 1784.  Again, Dr. Zhang concluded, "These scores appear to correlate with her impaired mental status," i.e., her sleepiness.  AR 1784.  Dr. Zhang discounted the results of the test and opined that Plaintiff had no impairment remembering simple instructions and only mild impairment remembering detailed, complex instructions.  AR 1785.

At the referenced psychiatric examination on January 11, 2014, Dr. Ijeaku noted that Plaintiff was driven to the appointment and "appears to be a suboptimal historian."  AR 1697.  Plaintiff exhibited "slumped" posture and "slow" speech.  AR 1698.  She denied auditory hallucinations.  AR 1700.  She told Dr. Ijeaku that she had completed one year of college and worked seven hours per week; she could drive, manage money, "run errands, shop, and cook."  AR 1698-99.

Dr. Ijeaku observed, "The clamant was very sluggish throughout the evaluation.  Her eye contact was avoided and poor."  Id.  At this exam, she could spell "world" backwards, but she could not state any similarities between an apple and a banana.  AR 1700.  Like Dr. Zhang, Dr. Ijeaku apparently did not believe that Plaintiff could not state any similarities between an apple and a banana, because Dr. Ijeaku opined that Plaintiff had only "moderate" impairments understanding and carrying out "complex" instructions.  AR 1701.

---

[3] Dr. Zhang's report does not state how long the interview lasted.

In her reply, Plaintiff argues that these two examinations do not support the conclusion that Plaintiff used suboptimal effort on the mental health tests administered. (JS at 21.) As to Dr. Zhang, Plaintiff relies on the statements that Dr. Zhang found Plaintiff "reasonably cooperative" and found her poor results on the IQ and memory tests were "consistent" with her impaired mental status. (Id.) Even in her reply, Plaintiff did not discuss Dr. Ijeaku. (Id.)

The ALJ's finding that Plaintiff put forth suboptimal effort on Dr. Zhang's testing is supported by substantial evidence. The evidence shows that Plaintiff drove herself to the appointment; Plaintiff testified that she does not take her pain medication when she drives.[4] AR 961. Plaintiff then consumed "several pain pills" during the appointment, apparently without discussing with Dr. Zhang the possibility of waiting until the examination was over. She "fell asleep a few times" during the course of the examination, and she scored below the level of intellectual disability on the IQ test (i.e., in the bottom 2%) – a score inconsistent with the level of intellectual functioning demonstrated by her activities.[5] AR 1782-83.

With Dr. Ijeaku, Plaintiff was so "sluggish" during the examination (possibly due to medication) that she was unable to name any similarities between an apple and a banana. AR 1700. This is not representative of the mental abilities of a person who can engage in Plaintiff's activities, suggesting Plaintiff intentionally

---

[4] At the September 2015 hearing, however, Plaintiff told the ALJ that she would drive home. AR 961-62. The ALJ observed Plaintiff take pain medication during the hearing. AR 918.

[5] For example, Plaintiff can drive and manage her own finances. She works part-time as a recess monitor at her children's school. In 2015, she took several online classes, receiving a "C" grade in one. AR 960. One would expect someone with sufficient intellectual functioning to drive, pay bills, be responsible for children, operate a computer, and pass an online class to be able to name at least one similarity between a boat and a car (or, for Dr. Ijeaku's test, between an apple and a banana).

failed to provide appropriate answers or medicated herself to the point where she could not respond appropriately.

c. <u>Reasons Three</u>:  Non-Compliance with Prescribed Treatment.

A claimant's decision not to follow or receive recommended treatment can be considered in assessing subjective symptom testimony.  <u>See</u> 20 C.F.R. § 416.930(b) ("If you do not follow the prescribed treatment without a good reason, we will not find you disabled[.]"); <u>Molina</u>, 674 F.3d at 1113 ("We have long held that, in assessing a claimant's credibility, the ALJ may proper rely on unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment."); <u>Satter v. Colvin</u>, 2016 WL 1226621, at *4 (D. Idaho Mar. 28, 2016) ("[T]he fact that Petitioner may not have followed his medical providers' treatment protocols does not mean <u>ipso</u> <u>facto</u> that he is not entitled to disability benefits; rather, such a circumstance is excused when the reason for not doing so is justified.").

Here, the ALJ found that Plaintiff was taking more pain medication than her doctors had advised, as follows:

> Dr. Francis [a medical expert] testified at the hearing that long-term use of prescribed medication could cause enhanced perception of pain. He felt that the claimant was taking an excessive amount of medication.  [AR 9532-53.]  As discussed above, medical treatment records also indicated that the claimant was advised to cut down on the amount of pain medication she was taking.  (AR 1932[6]; *see also* AR 2315.[7])  Although the undersigned does not find the claimant's

---

[6] On 10/1/14, gastroenterologist Michael Tsung diagnosed Plaintiff with "gastroparesis, likely due to opiates."  AR 1932.  He opined, "There is no great treatment for this except the cessation of opiates."  <u>Id.</u>  He advised her to "limit opiate use."  <u>Id.</u>

[7] In March 2015, Plaintiff told Kaiser, "I have been mixing my pain meds

use of prescription pain medication to be a severe impairment that is
material to the determination of disability, it is one factor to consider
in assessing the claimant's credibility. It is also evidence of non-
compliance with prescribed treatment.

AR 918.

ALJs may consider "the type, dosage, effectiveness, and side effects of any medication" the claimant takes or has taken to alleviate pain or other symptoms in order to evaluate the claimant's testimony concerning the limiting effects of pain. See 20 CFR §§ 404.1529, 416.929 (effective to March 26, 2017). Thus, the ALJ could consider Dr. Francis's testimony that "long-term use" of prescription pain medication can result in an "enhanced perception of pain," such that "in cases like this, it becomes impossible to determine how much of the pain is from the … musculoskeletal source of the pain." AR 953. When considered along with the largely mild or moderate objective medical evidence, this provides a clear and convincing reason to disbelieve Plaintiff's testimony that her impairments cause her disabling pain.

          d. <u>Reason Four:</u> Plaintiff's Inconsistent Statements.

The ALJ identified the following three inconsistencies in Plaintiff's statements as a reason for discounting Plaintiff's subjective symptom testimony:

[A]t the hearing, the claimant testified that she last worked in 2012 or
2013 as a school proctor, yet earning records indicated that the
claimant also worked in the first and second quarter of 2014 for the

---

with Tylenol so I don't have to take all that stuff but it doesn't work." AR 2262. At a June 2015 Kaiser office visit, Plaintiff complained of back and neck pain and was "concerned about number of pills she is taking" which included "Dilaudid [hydromorphone]/Percocet [Oxycodone and Acetaminophen] /Fentanyl," all opioids. AR 2315. She was "advised that she should not use more medication, but should cut down." Id.

Victor school district. (AR 1163). The claimant also testified that she only stopped working because they did not need her any more, not because of a physical or mental disability. Moreover, as described above, the claimant was collecting unemployment benefits in 2014 (AR 132). In California, in order to collect unemployment benefits, a person must certify that they are able and willing to work. This is inconsistent with the claimant's claims of disability.

AR 918-19.

### i. Date of Last Work.

At the second hearing in September 2015, Plaintiff testified that she was not working and had last worked as a school proctor when her son was in third grade, but he was in sixth grade now. AR 938. The ALJ asked, "So, 2012?" Id. Plaintiff responded, "It's probably like 2013, like the ending, May – I'm sorry. I'm not sure on the exact date." Id. Records show her last pay from the school district was for the second quarter of 2014, consistent with the end of the 2013-2014 school year. AR 1163.

Given Plaintiff's acknowledged uncertainty about the date and the fact that her reference to "like 2013, like the ending, May" could have been a reference to the end of the 2013-2014 school year, the record does not support finding that Plaintiff intentionally made an inconsistent statement about her last date of work that would serve as a clear and convincing reason for discounting her pain testimony.

### ii. Reason for Stopping Work.

In her DIB application filed on November 15, 2010, Plaintiff stated, "I became unable to work because of my disabling condition on December 10, 2009." AR 127. She affirmed that this statement was true. AR 128. In her "work history report," Plaintiff stated that she worked as a hairstylist from 2000 to 12/10/09. AR 157. She worked 8 hours/day, 3 days/week and carried small items like shampoo

15

bottles "mostly all my shift." AR 160. In her "past work summary," Plaintiff stated that she was only "self-employed" as a hairstylist and stopped working as both a hairstylist *and* a warehouse worker on 12/10/09. AR 191.

At the first hearing, Plaintiff's counsel amended the alleged onset date to October 1, 2010, stating that Plaintiff's DIB application "came on the heels of her discontinuing work at SGA [substantial gainful activity] levels." AR 29. Plaintiff testified that she worked as an unlicensed hairstylist until October 2010. AR 34.

At the second hearing, Plaintiff testified that she stopped working as a school proctor because "they didn't need me anymore." AR 939.

In the above-quoted portion of the ALJ's decision, the ALJ was apparently referring to Plaintiff's testimony about why she stopped working as a school proctor. Plaintiff testified that she worked as a school proctor approximately 1.5 hours each school day while seeking DIB. AR 42. There is nothing inconsistent about Plaintiff pursuing a claim for DIB and stopping her part-time work as a proctor because the school no longer needed her (as opposed to because she was too impaired to perform that work). While it appears that Plaintiff made inconsistent statements about whether she stopped *other* work in 2009 or 2010, the ALJ did not clearly cite that inconsistency as a reason for discounting Plaintiff's subjective symptom testimony. This Court cannot affirm an ALJ's adverse credibility finding for reasons not stated by the ALJ. See Connett v. Barnhart, 340 F.3d 871, 874 (9th Cir. 2003) (holding that district court erred by relying on reasons for discounting claimant's testimony other than reasons stated by ALJ, even though record supported reasons on which district court had relied).

### iii. Worker's Compensation.

The ALJ found "unemployment income in 2014 in the amount of $9,088" citing Exhibit 4D. AR 912; AR 919 [referring again to 2014 benefits citing Ex. 4D].) Exhibit 4D is a 1-page document that refers to dates in 2010, 2011 and 2012, but not 2014. AR 132. Regardless of whether Plaintiff received unemployment

benefits in 2014, AR 132 *does* show that she received unemployment benefits after her claimed onset date, so the Court will consider this reason.

Plaintiff argues that "court should no longer consider unemployment benefits as a basis for discrediting testimony because the agency deems that basis improper and grounds for referral," citing Quang Han Van v. Bowen, 882 F.2d 1453, 1457 (9th Cir. 1989) and Holohan, 246 F.3d at 1202. (JS at 23.) The first case does not discuss unemployment benefits and simply holds courts should defer to Social Security Rulings unless they are "plainly erroneous or inconsistent with the Act or regulations;" the second case (at the pin cite provided) discusses the treating physician rule. Neither supports Plaintiff's argument.

In Copeland v. Bowen, 861 F.2d 536, 542 (9th Cir. 1988), the Ninth Circuit affirmed the ALJ's discrediting the claimant's subjective pain testimony for reasons including "the fact that he left work because he was laid off (although allegedly because of medical reasons) [and] received unemployment insurance benefits thereafter (apparently considering himself capable of work and holding himself out as available for work)."

Citing Copeland, the Ninth Circuit confirmed twenty years later that "receipt of unemployment benefits can undermine claimant's alleged inability to work full-time." Carmickle v. Comm'r of SSA, 533 F.3d 1155, 1161-62 (9th Cir. 2008). The record in that case, however, did not establish whether the claimant "held himself out as available for full-time or part-time work," and "[o]nly the former is inconsistent with his disability allegations." Id. The Ninth Circuit found that "the ALJ's credibility finding [based on Carmickle's receipt of unemployment benefits was] not supported by substantial evidence," because there was no evidence of what representations the claimant had made to obtain unemployment benefits. Id. There was evidence that the claimant was attending college full-time, suggesting that he might have certified himself to be available only for part-time work. Id. at 1160. Because the ALJ had cited other reasons supported by substantial evidence, the

Ninth Circuit went on to hold that "the ALJ's decision finding Carmickle less than fully credible is valid, despite the errors identified above." Id. at 1163.

In Ghanim v. Colvin, 763 F.3d at 1165, the Ninth Circuit considered an ALJ's decision to discount subjective symptom testimony "because [the claimant] received unemployment benefits after the alleged onset date of his disability." Citing Copeland, the court found that "[c]ontinued receipt of unemployment benefits does cast doubt on a claim of disability, as it shows that an applicant holds himself out as capable of working." Id. The court, however, pointed out that "Ghanim actually declined unemployment benefits within about a month of his onset date; rather than undercut his claim of disability, this prompt refusal of unemployment benefits supports it." Id.

Effective January 1, 2002 (i.e., between the Ninth Circuit's decisions in Copeland and Carmickle), the California Legislature enacted a statute that makes persons only available for part-time work eligible for unemployment benefits under some limited circumstances:

> An unemployed individual shall not be disqualified for eligibility for unemployment compensation benefits solely on the basis that he or she is only available for part-time work. If an individual restricts his or her availability to part-time work, he or she may be considered to be able to work and available for work pursuant to subdivision (c) of Section 1253 if it is determined that all of following conditions exist:
>
> (a) The claim is based on the part-time employment.
>
> (b) The claimant is actively seeking and is willing to accept work under essentially the same conditions as existed while the wage credits were accrued.
>
> (c) The claimant imposes no other restrictions and is in a labor market in which a reasonable demand exists for the part-time services

he or she offers.

Cal. Unemp. Ins. Code § 1253.8.

Thus, Carmickle did not overrule Copeland. Rather, California law changed between the two decisions, such that what was true when Copeland was decided (i.e., receipt of unemployment benefits *necessarily* meant the claimant had made representations inconsistent with seeking DIB or SSI) was no longer true when Carmickle was decided.

In Burke v. Colvin, 649 F. App'x 495, 496 (9th Cir. 2016), citing Carmickle, the Ninth Circuit held that the "ALJ erred in concluding that Burke's application for and receipt of unemployment benefits undermines her credibility where the record does not establish whether Burke held herself 'out as available for full-time or part-time work.'" The Ninth Circuit indicated that the ALJ had "failed to fulfill his duty to fully and fairly develop the record because the ALJ failed to ask Burke questions regarding her receipt of unemployment benefits …." Id. While the ALJ in Burke had a heightened duty because Burke was unrepresented, the combined lesson of Carmickle and Burke is that where records show a claimant received unemployment compensation, the ALJ must ask the claimant whether he/she claimed availability for part-time or full-time work before relying on receipt of unemployment compensation as an inconsistency that undermines the claimant's subjective symptom testimony. Here, the ALJ did not ask Claimant whether she claimed availability for part-time or full-time work. That said, claimants bear the burden of proving entitlement to benefits. Mark v. Celebrezze, 348 F.2d 289, 293 (9th Cir. 1965); see also 20 C.F.R. §§ 404.1512(a), 416.912(a) ("In general, you [claimant] have to prove to us that you are blind or disabled... This means that you must furnish medical and other evidence that we can use to reach conclusions about your medical impairment(s)"). A represented claimant, upon seeing that the ALJ has relied on receipt of unemployment compensation to discount subjective symptom testimony, should either present to the Appeals Council evidence that

he/she only claimed availability for part-time work or else waives any challenge to the ALJ's finding of inconsistency. This rule is consistent with the facts that (1) claimants should know what representations they made to obtain unemployment compensation, (2) claimants can easily submit declarations providing that information, and (3) qualifying for unemployment compensation based on availability for only part-time work is atypical. Under the facts of this case, the Court finds that Plaintiff waived her challenge to the ALJ's finding of inconsistency based on her receipt of unemployment benefits.[8]

> e. <u>Reason Five</u>: Mild and Conservative Treatment.

A condition with symptoms that can be adequately controlled with medication and conservative treatment cannot be the basis of a claim for disability benefits. <u>Warre v. Comm'r of SSA</u>, 439 F.3d 1001, 1006 (9th Cir. 2006). An ALJ may discount a claimant's testimony regarding the severity of an impairment where the claimant has received conservative treatment. <u>Parra</u>, 481 F.3d at 751 (ALJ properly discredited testimony of disabling pain that was "treated with an over-the-counter pain medication"). This is particularly true where a treating physician recommended a more aggressive treatment, and the claimant rejected it. <u>Molina</u>, 674 F.3d at 1113 ("We have long held that, in assessing a claimant's credibility, the ALJ may proper rely on unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment.").

> i. The ALJ's Findings and the Medical Evidence.

In this case, the ALJ found as follows:

> The record shows that the claimant has generally received mild and conservative treatment. During her course of treatment, the claimant

---

[8] In the alternative, even if the ALJ did err in this regard, the ALJ gave sufficient other clear and convincing reasons to discount Plaintiff's subjective symptom testimony.

was only given pain medication and physical therapy, which are not
indicative of disability-level impairments. [citations] No other more
invasive or drastic treatment plan was recommended, such as surgery.
Although notations indicated that the claimant received injections for
her neck pain (AR 582[9]), the record does not indicate the frequency or
duration of the injections.

AR 914-15.

Regarding surgery, at the first hearing in 2011, Plaintiff's counsel indicated that "there is a surgical procedure that's being discussed and that [while Plaintiff] initially was reluctant to do so, she's [now] inclined to have it done. So that's what will be happening hopefully with[in] the next 90 to 120 days." AR 31. Plaintiff told the ALJ there was a plan to perform fusion surgery on her neck. AR 34. A 5/13/15 note by Kaiser neurosurgeon Dr. Goldenberg states, "She was last seen by NS [neurosurgery] in 2012[10] and there was no indication for surgery at that time. … NO indication for NS at this time." AR 2262. As of the second hearing in September 2015, however, there were still no records of any surgery or any medical recommendations for surgery to address Plaintiff's back or neck pain.

Regarding injections, Kaiser Physical Therapist ("PT") Zavala met with

---

[9] This 3/26/12 Kaiser record states under "History" that Plaintiff has "chronic neck pain" and has "tried physical therapy, injections, acupuncture …. No relief with ESI [epidural steroid injection], PT, exercises or meds." AR 582. The administrative record contains records from one 2011 visit to acupuncturist, Mr. Lim, as a referral from Kaiser for "pain control." AR 916, citing AR 421-22. Later in 2013, Plaintiff told Dr. Moazzaz that she had "not had any injections." AR 1692.

[10] A 7/9/12 notes says Kaiser Dr. Stiner "discussed with her the fact that I did not think that surgery would treat her thoracic spine pain and that I am recommending that she continue with conservative management." AR 2262. The recommended conservative management was "NSAIDs [non-opiate pain medication], physical therapy with back education, weight loss, and core strengthening exercises such as Yoga …." Id.

Plaintiff on 1/28/14 for thirty minutes and drafted an "Initial Eval Plan of Care."
AR 1725, 1728. She noted that Plaintiff reported "no help with all PT sessions in
the past" and "had epidural since last PT visits without help." AR 1726. The plan
was for physical therapy once every two weeks for twelve weeks. Id. Plaintiff,
however, never returned for another PT session and was discharged from physical
therapy as of 2/28/14. AR 1728. Neither party has cited any records prior to 2015
reflecting a medical source giving Plaintiff injections for pain management (versus
records of Plaintiff telling medical sources that she had received injections).
Indeed, the ALJ noted the lack of such evidence (AR 915), giving Plaintiff the
opportunity to provide it to the Appeals Council, but Plaintiff did not.

In April 2015, Plaintiff went to Kaiser complaining of neck pain "different
than usual pain; states involved in a car accident 2 weeks ago from neck to lower
back different than usual pain – mva [motor vehicle accident] 2 weeks ago." AR
2143. She received a Toradol injection for her back pain. AR 2146-57.

Plaintiff also cites AR 2262-63 as a record purportedly showing that Plaintiff
"underwent injections in 2015." (JS at 22.) In fact, this 5/13/15 Kaiser note
reflects that Plaintiff requested an appointment with a neurosurgeon in Fontana but
was told that there was no reason for such an appointment. AR 2262. The note
copies earlier 2012 notes from Dr. Stiner in which he recommended "conservative
treatment" rather than surgery and added that Plaintiff may "benefit from and
consider" new treatments including a "pain management consult" and "guided
steroid injections." AR 2262-63. The cited record does not provide evidence that
Plaintiff received injections in 2012 or 2015.

Regarding physical therapy, Plaintiff was referred in September 2010. AR
279. After four sessions, she was discharged in November 2010 "due to lack of
progress and patient request." AR 278-79. There was "no progress since initial
evaluation." AR 283. "Patient wants to hold on physical therapy until she follows
up with MD." AR 277.

Plaintiff did additional physical therapy with PT Zavala on 3/3/11 and 3/10 11. AR 424-26, 435. At the second session, she reported pain at a level of 6/10. AR 424. On June 18, 2013, Plaintiff underwent another initial evaluation for physical therapy. AR 1627. Plaintiff's second visit was June 25, 2013. AR 1639. She was scheduled to start a 6-week pain management class on 7/22/13. AR 1653. Plaintiff did one additional physical therapy with PT Zavala on 1/28/14, but the discharge dated 2/28/14 says, "status at time of discharge is unknown as patient failed to follow-up with therapy." AR 1728.

Regarding medication, the records show that some doctor(s) prescribed Plaintiff pain medication for years, which Plaintiff continued to take despite reporting no or little improvement. Other doctors recommended that Plaintiff use non-opiate pain medication or reduce her use of opiates. See the following records (in chronological order):

• AR 328 (December 2009 [prior to onset date]: "no meds taken; was off work last Friday due to pain.");

• AR 230 (May 2010 [prior to onset date]: Plaintiff reported pain continuing after 2007 right shoulder injury and surgery; "she would like to refill meds that helped her in the past;" her medications at that time did not include opiates);

• AR 244 (November 2010: Plaintiff taking Tramadol and Percocet [both opiates] with pain at 8-9/10);

• AR 255-57 (December 2010: "OK to cont using the Motrin, Percocet and Soma [a muscle relaxant]" but "Percocet should be max of 8 pills" and "Soma should be approx. 4-6 pills per day max;" recommended acupuncture, heat, and stretching);

• AR 492 (November 2011: medications include Tylenol, Soma, Vicodin, and Motrin);

• AR 538 (February 2012: Plaintiff told to continue using Soma, Dilaudid [an opioid], and Percocet "as needed");

23

• AR 33-34 (May 2012 hearing: Plaintiff was taking Soma [6 per day], Percocet, and Dilaudid [3 per day] and still had pain at 8/10 level);

• AR 2262-63 (July 2012: Dr. Stiner recommended "conservative" pain management that should include "NSAIDs" and exercise; noted "patient may also benefit from and consider … narcotic pain medications ….");

• AR 1654 (June 2013: Goal to eliminate use of Soma and Percocet and use only "one opioid/narcotic pain medication");

• AR 1932 (October 2014: Dr. Tsung advises Plaintiff to reduce opioid use);

• AR 2315 (March 2015: Plaintiff "advised that she should not use more medication, but should cut down.");

• AR 943, 956-58 (September 2015 hearing: Plaintiff was taking Percocet, a Fentanyl patch, baclofen [muscle relaxant], Dilantin [anti-convulsant], Celexa [anti-depressant], Ambien [sedative], Ativan [sedative/anti-anxiety[11]], and Lidocaine ointment; the only side-effect she identified was that they make her "irritated and like agitated." She took Celexa, Ativan, and Dilantin at the hearing.)

ii.    Plaintiff's Claims of Error.

First, Plaintiff argues that the ALJ's finding of "mild and conservative treatment" is "inconsistent with the ALJs findings of [Plaintiff's *severe* impairments …." (JS at 9.) Not so. While ALJs may at step two cite conservative treatment to conclude that an impairment is not severe, an ALJ may cite conservative treatment for severe impairments in evaluating a claimant's subjective symptom testimony about pain. See Johnson v. Shalala, 60 F.3d 1428, 1431, 1434 (affirming where ALJ found that claimant suffered from severe impairment and cited conservative treatment to discount claims of debilitating pain).

---

[11] In 2009, Plaintiff told Kaiser that Ativan "makes her too sleepy so does not take." AR 336. In 2011, Plaintiff reported she was taking Ativan for anxiety attacks, but "since starting medication, her sx [symptoms] have resolved." AR 410.

24

Second, Plaintiff argues that that the ALJ's finding of "mild and conservative treatment" is not supported by substantial evidence because "Narcotic medications are not a form of conservative treatment." (JS at 9.)

In making this argument, Plaintiff misunderstands the crux of the ALJ's evaluation of Plaintiff's testimony. The relevant question is not whether a particular course of treatment is, or is not, conservative in the abstract; the relevant question is whether the treatment received was *more* conservative than one would expect in light of the claimant's statements about the degree of functional limitations caused by pain. See, e.g., Ferguson v. Berryhill, No. 16-02186, 2017 U.S. Dist. LEXIS 105493, at *11 (C.D. Cal. July 7, 2017) (upholding ALJ's rejecting of Plaintiff's testimony where plaintiff received conservative, effective treatment, which included narcotic medication); Wallace v. Berryhill, No. 16-02064, 2017 U.S. Dist. LEXIS 141354, at *15 (C.D. Cal. Aug. 31, 2017) (upholding ALJ's rejection of physician's opinion as inconsistent with "conservative" treatment where claimant took Tramadol for years); Kelly v. Colvin, 15- 06154, 2016 U.S. Dist. Lexis 124261, at *11 (C.D. Cal. Sept. 13, 2016) (upholding ALJ's determination that treating consisting of "physical therapy and medications such as Tramadol, Naproxen, Ultram, Hydrocodone, and Ibuprofen" was conservative); Medel v. Colvin, 13- 2052, 2014 U.S. Dist. LEXIS 159933, at *27 (C.D. Cal. Nov. 13, 2014) (affirming AL's characterization of claimant's treatment as conservative where he had been "prescribed only Vicodin and Tylenol for his allegedly debilitating low-back pain"); Morris v. Colvin, 13- 6236, 2014 U.S. Dist. LEXIS 77782, at *12 (C.D. Cal. June 3, 2014) (finding that ALJ permissibly discounted plaintiff's credibility in part because plaintiff received conservative treatment consisting of use of TENS unit and Vicodin); Jimenez v. Colvin, 12- 01676, 2013 U.S. Dist. LEXIS 88614, at *14 (C.D. Cal. June 24, 2013) (upholding ALJ's determination that treating "consisting of Tramadol and over-the-counter Motrin" was conservative); Walter v. Astrue, 09- 1569, 2011 U.S. Dist.

LEXIS 38179, at *9 (C.D. Cal. Apr. 6, 2011) (finding that ALJ permissibly discounted claimant's credibility based on conservative treatment, which included Vicodin, physical therapy, and a single injection).

Here, the 3-volume administrative record contains (1) recommendations from surgeons in 2012 not to pursue surgery (AR 2262) and no evidence that Plaintiff pursued surgical options after that point, (2) brief or aborted courses of physical therapy (AR 278-29, 424-26, 235, 1639, 1728); (3) one injection administered after a car accident (AR 2146-57); (4) records of Plaintiff taking or requesting pain medication over several years despite reporting no significant relief (AR 244, 255-57, 492, 538, 33-34, 943, 956-58); and (5) multiple doctors recommending that Plaintiff not use or reduce use of narcotic pain medication (AR 255-57, 1654, 1932, 2315). This history of pain management treatments is inconsistent with Plaintiff's claims of disabling pain since 2010, i.e., it is more conservative than one would expect for a person who must spend half her waking hours lying down and who suffers constant neck-to-toe pain. As evidenced by the citations above, the fact that her treatment included prescription opioids does not undermine this conclusion.

### 3. Issue One Summary.

Even setting aside the ALJ's citation to Plaintiff's inconsistent statements, the ALJ gave sufficient clear and convincing reasons supported by substantial evidence for discounting Plaintiff's testimony that she suffers from disabling pain: lack of supporting medical evidence, failure to use best effort during psychological testing, non-compliance with prescribed treatment, and a history of conservative treatment.

## B. **ISSUE TWO: The VE's Identification of Suitable Work.**

### 1. Rules Governing the Identification of Suitable Work.

Pursuant to Social Security Ruling ("SSR") 00-4p, 2000 SSR LEXIS 8, when a VE provides evidence about the requirements of a job or occupation, the ALJ has "an affirmative responsibility to ask about any possible conflict" between that

testimony and the DOT and to obtain a reasonable explanation for any apparent conflict. 2000 SSR LEXIS 8 at *9, 2000 WL 1898704, at *4 (Dec. 4, 2000). An ALJ may not rely on a VE's testimony without first inquiring whether the testimony conflicts with the DOT. <u>Massachi v. Astrue</u>, 486 F.3d 1149, 1152 (9th Cir. 2007).

As a rule, neither the DOT nor the testimony of the VE "automatically 'trumps' when there is a conflict." <u>Id.</u> at 1153 (footnote omitted). Accordingly, the ALJ must first ascertain whether a conflict exists. <u>Id.</u> If so, the ALJ "must then determine whether the [VE's] explanation for the conflict is reasonable and whether a basis exists for relying on the expert rather than the [DOT]." <u>Id.</u>

### 2. Waiver.

As an initial matter, Defendant notes that Plaintiff failed to raise the issue of any conflicts both at the hearing (AR 962-67, 921) or before the Appeals Council (AR 895-96). Defendant contends that Plaintiff waived this issue, citing <u>Shaibi v. Berryhill</u>, 870 F.3d 874 (9th Cir. 2017). (JS at 27.)

In <u>Shaibi</u>, the Ninth Circuit held that "a Social Security claimant who wishes to challenge the factual basis of a vocational expert's estimate of the number of available jobs in the regional and national economies must raise this challenge … at some point during administrative proceedings to preserve the challenge on appeal in federal district court." <u>Id.</u> at 876. <u>Shaibi</u> did not concern alleged conflicts between the VE's testimony and the DOT or the ALJ's duty of inquiry under SSR 00-4p. It is therefore not persuasive on the issue of waiver in this case.

### 3. Plaintiff's RFC for Fine and Gross Manipulation.

All the inconsistencies claimed by Plaintiff concern her RFC for using her hands and fingers, i.e., she "can engage in frequent, but not constant, fine and gross manipulative activities bilaterally." AR 913-14. "Frequent" is defined as up to two-thirds of the time. <u>See</u> SSR 83-10, 1983 WL 31251.

The ALJ explained how he assessed this aspect of Plaintiff's RFC as follows:

As for the claimant's carpal tunnel syndrome, a nerve conduction study indicated mild carpal tunnel syndrome and mild ulnar neuropathy at the right wrist. (AR 535.) While the claimant complained of chronic bilateral hand pain, the record does not indicate any significant treatment. Although Dr. Moazzaz, the consultative examiner, noted that the claimant had reduced grip strength in the right hand, he did not find that the claimant had any limitations for find and gross manipulative activities. (AR 1692-96.) The undersigned finds that the claimant's residual functional capacity, which includes a restriction for frequent, but not constant, fine/gross manipulative activities bilaterally, takes into account the claimant's carpal tunnel syndrome, and is reasonable in light of the objective medical evidence.

AR 915.

a. Shoe Packer.

Plaintiff argues that the "occupation of shoe packer, DOT 920.687-166, requires constant handling and reaching, per the DOT." (JS at 25.) Plaintiff claims that this is inconsistent with her RFC, because the RFC limits her to "performing frequent, but not constant, fine and gross manipulative activities bilaterally." (Id., citing AR 913-14.)

The DOT *does* state that this job requires "constant" handling but no fingering. See DOT 920.687-166 on Westlaw. As used in the DOT, "handling" means "[s]eizing, holding, grasping, turning, or otherwise working with hand or hands." Brooks v. Astrue, No. CV 11-8645-JEM, 2012 U.S. Dist. LEXIS 86981, at *14 n.3 (C.D. Cal. June 22, 2012). In contrast, fingering means "[p]icking, pinching, or otherwise working primarily with fingers rather than with the whole hand or arm as in handling." Id.

"Handling" is a type of "gross" manipulative activity, while "fingering" is a

type of "fine" manipulative activity.  See Mendoza v. Colvin, 2017 U.S. Dist. LEXIS 129014, at *24 (S.D. Cal. Aug. 11, 2017) (medical source identified "writing or typing" as examples of "fine manipulative activities" and "handling or grasping" as examples of "gross manipulative activities").  By requiring "constant" handling, the DOT's description of this job is inconsistent with Plaintiff's RFC.

The Commissioner concedes this point but argues that any error is harmless, because there is no inconsistency between Plaintiff's RFC and the other two jobs identified by the VE, and each of those job exists in significant numbers in the national economy.  (JS at 28.)

          b.  Advertising-Material Distributor and Plastic Toy Assembler.

Plaintiff argues that the DOT describes both jobs as requiring "at least average manual dexterity," and that the "ALJ failed to make a finding that [Plaintiff] retained average dexterity," despite finding that Plaintiff suffers from the severe impairment of carpal tunnel syndrome.  (JS at 25.)  Per Plaintiff, how *often* she can use her hands (i.e., frequent handling) is a different consideration from how *well* she can use her hands (i.e., average dexterity).  (JS at 30.)

The Commissioner responds that "the ALJ fully accommodated Plaintiff's carpal tunnel syndrome by limiting her to frequent fine and gross manipulation," and that the ALJ was not required to make a finding the Plaintiff "retained at least average dexterity" to avoid a conflict with the DOT.  (JS at 27-28.)

Per the DOT, working as an advertising-material distributor requires "frequent" handling and fingering, which is consistent with Plaintiff's RFC.  It requires "level 4" finger dexterity and "level 3" manual dexterity.  See DOT 230.687-010, 1991 WL 672162.  Working as a plastic toy assembler requires also "frequent" handling and fingering.  It requires "level 3" manual and finger dexterity.  See DOT 731.687-034, 1991 WL 679819.

The DOT provides ratings for certain "aptitudes," such as manual dexterity and finger dexterity.  Generally, an "aptitude" is an "inclination, a natural ability,

29

talent, or capacity for learning," as distinct from a learned "skill." Weaver v. Sec'y of Health & Human Servs., 722 F.2d 310, 311 (6th Cir. 1983). Thus, manual dexterity refers to ability at manipulating things with one's hands, while finger dexterity refers to ability at manipulating things with one's fingers.

The DOT's rating scale for aptitudes uses 1 as the highest rating and 5 as the lowest, defined as follows:

1. The top 10 percent of the population. This segment of the population possesses an extremely high degree of the aptitude.

2. The highest third exclusive of the top 10 percent of the population. This segment of the population possesses an above average or high degree of the aptitude.

3. The middle third of the population. This segment of the population possesses a medium degree of the aptitude ranging from slightly below to slightly above average.

4. The lowest third exclusive of the bottom 10 percent of the population. This segment of the population possesses a below average or low degree of the aptitude.

5. The lowest 10 percent of the population. This segment of the population possesses a negligible degree of the aptitude.

Easterbrook v. Astrue, 2011 U.S. Dist. LEXIS 101480, at *9-10 n.1 (D. Neb. Sep. 8, 2011) (citing U.S. Department of Labor, Revised Handbook for Analyzing Jobs (1991)).

The Court agrees with Plaintiff that considering how *often* a worker must do an activity is different from considering how *well* a worker must do that activity to perform a job satisfactorily. This distinction is supported by the DOT itself which classifies how often a job requires handling and fingering (e.g., never, occasionally, frequently, or constantly) and separately rates on a scale of 1-5 the degree of manual and finger dexterity required to perform the job. See Palomino v. Colvin,

30

No. ED CV 14-212-SP, 2015 U.S. Dist. LEXIS 66120, at *9-10 (C.D. Cal. May 20, 2015) (remanding where claimant could perform "frequent fine manipulation and frequent gross manipulation," but the ALJ did not determine whether claimant had "average finger dexterity," a requirement of the jobs identified by the VE); <u>Guinn v. Colvin</u>, 2016 U.S. Dist. LEXIS 36362, at *19-20 (D. Del. Mar. 21, 2016) (holding RFC restriction to "very little tasks requiring dexterity and manipulation" was consistent with work requiring only level 4 or 5 dexterity).

Here, the RFC assessed by the ALJ is silent as to Plaintiff's dexterity. Because the ALJ did not make any findings concerning Plaintiff's dexterity rating, the ALJ did not include a maximum dexterity rating in the hypothetical posed to the VE, and the VE did not discuss the dexterity ratings of the proposed alternative jobs. <u>See</u> AR 962-65. Plaintiff argues that this aspect of the RFC is not supported by substantial evidence, i.e., the ALJ should have indicated that her finger dexterity is below average. (JS at 25 ["With her impairments, [Plaintiff] would not have the ability to perform an occupation requiring below average finger dexterity."].) Plaintiff argues that because the assessed RFC was incomplete (i.e., it did not address potential qualitative deficits in dexterity), the ALJ's hypothetical question to the VE was also incomplete, such that substantial evidence does not support the ALJ's conclusion (which relied on the VE's testimony) that Plaintiff could work as a distributor or assembler. (<u>Id.</u> at 25-26.)

The only evidence Plaintiff cites in support of a qualitative limitation on dexterity, however, are her 2012 carpal tunnel syndrome diagnosis and her own statements about hand pain and numbness. (<u>See</u> JS at 25-26, 30.) A diagnosis is not evidence of resulting functional limitations. <u>See</u> <u>Sierra v. Colvin</u>, No. 13-02285-CL, 2015 WL 5146938, at *3 (D. Or. Aug. 31, 2015) ("Plaintiff does not show any functional limitations caused by her obesity. Nor is there any medical evidence stating that her obesity causes functional limitations. A review of the record indicates that Plaintiff is considered obese. The gravity of this diagnosis is

not further discussed, and no limitation is addressed due to her obesity. The record does not contain any evidence that Plaintiff suffered any work related restrictions due to her obesity; and, Plaintiff, who was represented by counsel, did not raise the argument at her hearing. The record does not indicate that Plaintiff's obesity exacerbates her other impairments. Due to the absence of evidence, both in the record and at her hearing, that Plaintiff's obesity causes functional limitations, the ALJ did not err by failing to further address her obesity in determining Plaintiff's ability to work, and her RFC."). As discussed above, the ALJ gave clear and convincing reasons for discounting Plaintiff's subjective symptom testimony. Plaintiff does not point to any tests of dexterity or grip strength tests administered by a medical source that showed less-than-average results.

In contrast, there is substantial evidence in the record that Plaintiff has at least average dexterity skills, which supports the ALJ's decision not to include limits on dexterity in Plaintiff's RFC. In January 2011, Plaintiff indicated that she had no problem using her hands for dressing, bathing, and eating. AR 150. She could prepare frozen meals, fold laundry, and drive. AR 151-52. She could use a computer for shopping and completing online surveys as a hobby. AR 152-53. She indicated that she could answer online surveys "pretty well," and none of her alleged difficulties concerned using her hands. AR 153. When asked to identify how her impairments affect her functionality, she did not check the box to indicate that she was impaired "using hands." AR 154.

In October 2011, Plaintiff was referred for an MRI to determine if she has carpal tunnel syndrome. AR 481. In February 2012, she had still not been diagnosed, but her doctors ordered a nerve conduction study. AR 534. That study revealed "mild [carpal tunnel syndrome] and mild ulnar neuropathy at the wrist." AR 535. The physical exam conducted at the same time revealed that Plaintiff had "normal strength" and displays "no weakness or atrophy." Id. They issued Plaintiff a "contoured wrist brace" and "utilization instructions." AR 537.

In December 2013, Plaintiff told Dr. Moazzaz that she has "numbness and tingling" in her fingers, worse on the right. AR 1692. Dr. Moazzaz examined her hands and wrists and found both to have a range of motion "within normal limits." AR 1694. Dr. Moazzaz measured her upper extremity motor strength as 5/5. AR 1695. There is no mention in this report of carpal tunnel syndrome or a wrist brace.

In April 2015, Plaintiff told Dr. Hoang that she had numbness in both hands. AR 1787. Dr. Hoang assessed both wrists and hands as "within normal limits" with a full range of motion and no tenderness. AR 1789-90. Plaintiff had "no grip strength loss." AR 1790. Dr. Hoang left the "review of medical records section" blank, so it is unclear what records were reviewed. Despite the 2012 nerve induction study, Dr. Hoang found there were "no clinical findings of [carpal tunnel syndrome]." AR 1790. Dr. Hoang found Plaintiff's basic hand functions "well preserved with particular reference to gross handling and fine (dexterous movements) manipulation." AR 1791.

Dr. Francis testified that "as far as hand and wrist motion," Plaintiff could perform "fingering, grasping, typing, [and] data entry," and do those kinds of tasks up to "two thirds of the day." AR 951.

At the hearing, Plaintiff did not tell the ALJ that she wears a wrist brace. She told that ALJ that she had taken three online classes the prior semester and was re-taking two of them due to poor grades. AR 959-60. She was able to do the keyboarding required to take those classes with "1.5 inch fingernails." AR 917.

Based on this record, substantial evidence supports the ALJ's decision not to include in the RFC a limitation to below-average dexterity. The VE's testimony was neither inconsistent with the DOT nor with the assessed RFC.

/ / /

/ / /

/ / /

**VI.**

**CONCLUSION**

For the reasons stated above, IT IS ORDERED that judgment shall be entered AFFIRMING the decision of the Commissioner denying benefits.

DATED: June 19, 2018

_____
KAREN E. SCOTT
United States Magistrate Judge